UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA and LIBERTY
MUTUAL INSURANCE COMPANY,

        Plaintiffs,      **COMPLAINT**

  - against -        Case No.:

SILO CITY PHASE I LLC and SILO CITY
PHASE I HOUSING DEVELOPMENT FUND
COMPANY, INC.,

        Defendants.
---------------------------------------------------------------X

   The plaintiffs, **TRAVELERS CASUALTY AND SURETY COMPANY OF**

**AMERICA** and **LIBERTY MUTUAL INSURANCE COMPANY** (collectively, "the

Sureties"), as and for their Complaint against the above-named defendants, allege as follows:

## PARTIES

   1.  Travelers Casualty and Surety Company of America is a corporation organized

and existing pursuant to the laws of the State of Connecticut, with its principal place of business

in Hartford, Connecticut.

   2.  Liberty Mutual Insurance Company is a corporation organized and existing

pursuant to the laws of the State of Massachusetts, with its principal place of business in Boston,

Massachusetts.

   3.  Upon information and belief, defendant Silo City Phase I LLC is a limited

liability company organized and existing pursuant to the laws of the State of New York, with its

principal place of business at 487 Main Street #500, Buffalo, New York.

**CHIESA SHAHINIAN & GIANTOMASI PC** ▪ 11 Times Square, 34th Floor ▪ New York, New York 10036 ▪ (212) 973-0572

4.      Upon information and belief, the member of defendant Silo City Phase I LLC is Generation Development Group LLC.

5.      Upon information and belief, the members of General Development Group LLC are W. Marvin Wilmoth, Jr., and Anthony Ceroy.

6.      Upon information and belief, both Wilmoth and Ceroy are citizens of the State of Florida.

7.      Upon information and belief, defendant Silo City Phase I Housing Development Fund Company, Inc., is a corporation organized and existing pursuant to the laws of the State of New York, with its principal place of business at 111 NE 1st Street, 8th Floor, Miami, Florida.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 USC § 1332(a)(1), as this is an action between citizens of different States and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

9.      Venue is proper in this District pursuant to 28 USC § 1391(b), as a substantial part of the events or omissions giving rise to the claims alleged herein occurred within this District.

## FACTS

A.      The Project and the construction contract.

10.     On or about September 28, 2020, Defendants, as the "Owner", entered into a contract ("the Contract") with Arc Building Partners, LLC ("Arc"), for the construction of the "Silo City Phase I" project in Buffalo ("the Project") (pertinent pages of the Contract are annexed as Exhibit 1).

2

11.     The Contract is comprised of various standard form documents drafted by the American Institute of Architects (the "AIA"), as modified by Defendants.

12.     Arc is a construction management firm with offices at 100 South Elmwood Avenue, Buffalo.

13.     The Contract refers to Arc both as "Construction Manager" and as "Contractor".

14.     In the Contract, Arc and Defendants agreed that Arc would perform the construction and other obligations described therein in exchange for payment of up to a "guaranteed maximum price" (the "GMP") of $41,122,540.00.

15.     The GMP was subject to increase or decrease over the course of the Project, as changes may be made to the Project adding to or reducing the scope of work.

B.     The Bond.

16.     On or about October 12, 2020, the Sureties executed Performance Bond No. 015210377/107272705 (the "Bond") on behalf of Arc, as principal, in favor of Defendants, as "Owner", in the penal sum if $41,122,540.00, relative to the Contract (Exhibit 2).

17.     A performance bond is a tripartite contract where the surety (or sureties), acting as "secondary obligor", guaranties the performance of the work that is the subject of the bonded contract by the construction manager or contractor (the "principal") for the benefit of the other party to the contract (the "obligee" or "owner").

18.     The Bond is a standard form known as the "A312", also drafted by the AIA.

19.     Defendants selected and mandated the use of the A312 bond form.

20.     The A312 bond form contains various conditions precedent that Defendants must satisfy before the Sureties' obligation under the Bond matures.

3

21.     Section 3 requires that there not be an "Owner Default" (as defined in the Bond) under the Contract.

22.     Section 3.1 requires that Defendants provide notice to Arc and the Sureties that Defendants are "considering declaring a Contractor Default". Defendants may request a conference with Arc and the Sureties to discuss Arc's performance in such notice.

23.     Section 3.2 requires that Defendants declare a "Contractor Default", terminate the Contract, and notify the Sureties thereof.

24.     Section 14.3 defines "Contractor Default" as "[f]ailure of the Contractor, which has not been remedied or waived, to perform or otherwise comply with a material term of the Construction Contract."

25.     Section 3.3 requires that Defendants "agree[] to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the [Sureties] or to a contractor selected to perform the Construction Contract."

26.     Section 14.1 defines "Balance of the Contract Price" as

> [t]he total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

27.     Under section 5, "When the Owner has satisfied the conditions of Section 3, the [Sureties] shall promptly and at the [Sureties'] expense take one of the following actions", with sections 5.1 through 5.4 listing the specific actions that the Sureties may elect.

28.     Section 5.1 provides that the Sureties may "[a]rrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract".

4

29.     Section 5.2 provides that the Sureties may "[u]ndertake to perform and complete the Construction Contract itself, through its agents or independent contractors" that it selects to complete.

30.     Section 5.3 describes what is known as a "tender", where the Sureties obtain bids to complete the Contract, arrange for a new contract between Defendants and the selected bidder, and pay Defendants the difference between the bidder's price to complete the Contract and the Balance of the Contract Price.

31.     Section 5.4 allows the Sureties to waive their rights under sections 5.1, 5.2, and 5.3, and either (a) investigate and determine the amount of their liability under the Bond and pay that amount to Defendants (section 5.4.1) or (b) "[d]eny liability in whole or in part and notify [Defendants], citing the reasons for denial" (section 5.4.2).

32.     The purpose of section 5 is to allocate to the Sureties the opportunity to mitigate their damages and control their loss, by allowing the Sureties to determine the manner in which they will satisfy their performance bond obligation as listed in sections 5.1, 5.2, 5.3, and 5.4.

33.     The Sureties would not have executed the Bond without receiving the rights contained in section 5.

34.     An obligee's obligation to satisfy the conditions precedent in section 3 before the surety's obligation under the A312 performance bond arises ensures that the surety is afforded this opportunity to mitigate its damages and control its loss.

C.      Defendants terminate the Contract for default, immediately retain a replacement construction manager to complete the Contract, and continue to perform Arc's contract.

35.     During 2021, Defendants apparently became dissatisfied with Arc's performance of the Contract.

5

36.     By letter dated November 2, 2021 (with its attachments, Exhibit 3), addressed to the Sureties and copied to Arc's principal, Defendants advised the Sureties that they were "considering declaring a Contractor Default" and that they were not requesting a conference.

37.     This letter did not request a response from the Sureties.

38.     By letter dated November 11, 2021 (Exhibit 4), Defendants' representative requested that the Project's lenders consent to Defendants replacing Arc with a replacement contractor, RP Oak Hill Building Company.

39.     This e-mail states that certain funding entities already had advised that they would be "amenable" to replacing Arc with RP Oak Hill.

40.     By letter dated November 29, 2021 (with attachment, Exhibit 5), addressed to Arc's principal and copied to the Sureties, Defendants terminated the Contract "for substantial breaches of the Contract Documents, effective seven (7) days after the date of this letter".

41.     This letter stated that "[t]he Owner will finish the work by retaining another construction manager to complete the project and will hold Arc accountable for all corrective work and excess costs of completion."

42.     This letter further advised that Defendants would "assess whether to accept an assignment of all or some of [Arc's] subcontracts as is our right pursuant to Section 5.4 of the General Conditions" of the Contract.

43.     This letter does not mention a claim against the Bond, a demand upon the Sureties, or an intention to hold the Sureties liable "for all corrective work and excess costs of completion."

44.     To the contrary, the letter's statements that Defendants intended to "finish the work by retaining another construction manager to complete the project" and that Defendants

6

intended to "hold Arc accountable for all corrective work and excess costs of completion" without mentioning the Sureties indicated that Defendants did not intend to make a performance bond claim or demand upon the Sureties to perform.

45.     By letter dated November 29, 2021 (Exhibit 6), addressed to Arc's subcontractors, Defendants advised that they "expect that R&P Oakhill will take over construction management responsibilities including processing payments."

46.     This letter also advised the subcontractors that Defendants were "reviewing the subcontracts in place and are assessing whether to accept an assignment of all or some [of] the subcontractors as is our right pursuant to Section 5.4 of the General Conditions [of the Contract], AIA A201-2017."

47.     By letter December 2, 2021 (Exhibit 7), addressed to Arc's subcontractors and copied to Arc, the Sureties, and the project's architect, Defendants advised the subcontractors that they "hereby accept[] assignment of your subcontract with Arc Building Partners, LLC pursuant to Section 5.4 of the Contract (AIA Document A201) subject to the prior rights of the surety, if any."

48.     The letter further confirmed that, despite Arc's termination, the subcontractors "will have continued access to the site, your subcontract remains in effect, *and your work should continue per your subcontract agreement*" (emphasis added).

49.     The letter directed subcontractors to contact Chris Hogan or Mercedes Calway.

50.     At the time, Chris Hogan and Mercedes Calway were employees of RP Oakhill.

51.     After receiving Defendants' letter of November 2, 2021, the only communication the Sureties received from Defendants for the next month were copies of the letters referenced

7

above as being copied to the Sureties, with the last such letter being the December 2 letter

referenced in paragraph 44 above.

52.     Defendants did not advise the Sureties in any of these letters that they "agreed to

pay the Balance of the Contract Price in accordance with the terms of the Construction Contract

to the [Sureties] or to a contractor selected to perform the Construction Contract", as required by

section 3.3 of the Bond.

53.     Because the November 29 termination letter and the two December 2 letters made

it clear that Defendants intended to proceed with completion of the Contract on their own by

retaining their own replacement construction manager and taking an assignment of Arc's

subcontracts, which would be completely inconsistent with affording the Sureties their rights and

performance options under the Bond, and since Defendants had not satisfied section 3.3's

condition precedent, the Sureties did not respond to these letters.

54.     After receiving a copy of the December 2 letter referenced in paragraph 44, the

Sureties did not receive any correspondence or communication from Defendants for more than

an additional two months.

55.     The Sureties did not hear from Defendants again until Defendants' letter

addressed to the Sureties dated February 22, 2022 (Exhibit 8).

56.     In their February 22 letter, Defendants complained that they had not received a

response from the Sureties to their November 2 and November 29 letters, advised that they had

"engaged RP Oak Hill Building Company Inc. ('RP') to stabilize, assess, *and complete the*

*Project*", claimed that Defendants anticipated incurring approximately $13 million in additional

costs and damages as a result of Arc's default – including RP Oak Hill's "current estimate" that

the cost "to remediate and repair Arc's work *and to complete the Project* will exceed the original

**CHIESA SHAHINIAN & GIANTOMASI PC** ▪ 11 Times Square, 34th Floor ▪ New York, New York  10036 ▪ (212) 973-0572

contract price by approximately $11,000,000.00" – and stated that the letter constituted the seven days' notice required by section 6 of the Bond (emphasis added).

57.     By letter dated March 1, 2022 (Exhibit 9), the Sureties responded to Defendants' February 22 letter.

58.     The Sureties' letter advised Defendants that the Sureties were surprised to receive Defendants' February 22 letter, for the reasons described above.

59.     The Sureties' letter rejected Defendants' invocation of section 6 of the Bond and advised Defendants that they would initiate an investigation of what now appeared to be a claim against the performance bond.

60.     Defendants' response, dated March 3, 2022 (Exhibit 10), argued that Defendants had satisfied each of the Bond's conditions precedent, including the condition precedent in section 3.3 of the Bond.

61.     Specifically, Defendants contended that their November 29 termination letter's advice –  that they would "finish the work by retaining another construction manager to complete the project and will hold Arc accountable for all corrective work and excess costs of completion" – "was clear that the replacement contractor would be paid to complete the project, the cost was expected to exceed the balance of the contract, and Arc (and therefore the Sureties) would be liable for the excess costs."

62.     They further contended that the quoted language from the November 29 termination letter constitutes "an agreement to pay the balance of contract [price] 'to a contractor selected to perform the Construction Contract'".

63.     Even if the language of Defendants' November 29 termination letter somehow could be read as advising that Defendants were agreeing to pay the Balance of the Contract Price

9

"to a contractor selected to perform the Construction Contract", which the letter does not say, Defendants do not satisfy section 3.3's condition precedent by agreeing to pay the Balance of the Contract Price to a replacement contractor that Defendants unilaterally selected before the termination of Arc was effective, when the Bond provided the Sureties with the right to determine which performance option they would choose and to select a replacement contractor if the Sureties elected to proceed under section 5.1, 5.2, or 5.3.

64.     Defendants' March 3 letter confirmed that Defendants already hired their own replacement contractor, when it stated that the Sureties "ignored all of the notices and supporting documentation provided by their principal's default and termination, *and the hiring of a replacement contractor.*" (emphasis added)

65.     Pursuant to the November 29 termination letter (Exhibit 5), Defendants' termination of the Contract became effective on December 6, 2021.

66.     Upon information and belief, by December 6, 2021, Defendants and RP Oak Hill already had agreed that Defendants would retain RP Oak Hill to complete the performance of the Contract.

67.     Although executed by RP Oak Hill on January 7, 2022, and by Defendants on January 10, 2022, the formal written contract between RP Oak Hill and Defendants (the "RP Oak Hill Completion Contract") states that it is effective as of December 7, 2021, the day after Arc's termination became effective.  A copy of the pertinent portion of the RP Oak Hill Completion Contract is attached as Exhibit 11.

68.     The RP Oak Hill Completion Contract provides for RP Oak Hill to complete the Project.

**CHIESA SHAHINIAN & GIANTOMASI PC** ▪ 11 Times Square, 34th Floor ▪ New York, New York  10036 ▪ (212) 973-0572

69.     In the first substantive paragraph, the RP Oak Hill Completion contract states: "[n]otwithstanding any other provisions in this Contract, the Parties understand that the Project work has been started by prior contractor Arc Building Partners, LLC (the "Original Contractor") under a prior agreement (the "Prior Agreement"), *and this Contract is for Contractor's completion of the Project work . . .*" (emphasis added).

70.     The RP Oak Hill Completion Contract refers to Arc as "the Original Contractor".

71.     Like the Contract describes Arc as both "Construction Manager" and Contractor", the RP Oak Hill Completion Contract refers to RP Oak Hill both as "Construction Manager" and "Contractor".

72.     At no time prior to February 22, 2022, were the Sureties aware that Defendants and RP Oak Hill had entered into the RP Oak Hill Completion Contract.

73.     The Sureties received a copy of the RP Oak Hill Completion Contract from Defendants in their production of documents that the Sureties requested in connection with the investigation that they initiated after receipt of Defendants' February 22 letter.

74.     Defendants also produced copies of the payment applications for the Contract's scope of work.

75.     The payment applications demonstrate that, as of February 28, 2022, Defendants depleted the Balance of the Contract Price by nearly $1.4 million after terminating Arc for default.

76.     The payment applications also establish that Defendants have been proceeding with the completion of the performance of Contract since their termination of Arc for default.

77.     Specifically, according to payment application 15 (Exhibit 12), which is for work performed through December 31, 2021 – a month after Arc's termination for default –

11

Defendants paid $1,037,382.65 to Arc's former subcontractors, including $790,118.75 for "work completed".

78.     Payment application 15 reflects that these payments were for work that falls within the scope of the work Arc was to perform under Contract.

79.     The subcontractors' various payment applications that constitute the support for payment application 15, which are attached to payment application 15, further demonstrate that Defendants were proceeding with the completion of the Contract in December 2021.

80.     Payment application 15 identifies the contractor as "N/A – Owner to Direct Pay Subs".

81.     Payment application 16 (Exhibit 13), for work performed through January 31, 2022, is also called "RPO #1".

82.     Upon information and belief, "RPO #1" means RP Oak Hill payment application 1.

83.     In payment application 16, RP Oak Hill is identified as the "contractor".

84.     The dollar amounts in payment application 16 are continuations from the prior payment applications submitted by Arc and then payment application 15, in which Defendants paid subcontractors directly for work performed after Arc's termination for default.

85.     Payment application 16 reflects that Defendants paid RP Oak Hill $184,330.84 for work performed in furtherance of completing the Contract.

86.     The subcontractors' various payment applications that constitute the support for payment application 16, which are attached to payment application 16, further establish that Defendants continued to proceed with the completion of the Contract in January 2022.

12

87.     Payment application 17 (Exhibit 14) – also called "RPO #02" – is for work performed through February 28, 2022.

88.     Upon information and belief, "RPO #02" means RP Oak Hill payment application 2.

89.     In payment application 17, RP Oak Hill is identified as the "contractor".

90.     The dollar amounts in payment application 17 are, again, continuations from the prior payment applications submitted by Arc.

91.     Payment application 17 reflects that Defendants paid RP Oak Hill $174,456.44 for work performed in furtherance of completing the Contract.

92.     Again, the subcontractors' various payment applications that constitute the support for payment application 17, which are attached to payment application 17, further demonstrate that Defendants continued to proceed with the completion of the Contract in February 2022.

93.     All of this work in furtherance of completing the Contract occurred without Defendants having satisfied the condition precedent contained in section 3.3 of the Bond.

94.     All of this work in furtherance of completing the Contract occurred without Defendants having provided the Sureties with an opportunity to exercise any of their remedies under the Bond.

95.     Defendants, through counsel, sent the Sureties a letter dated March 22, 2022 (Exhibit 15), which again confirmed that Defendants were completing the Contract through RP Oak Hill as replacement contractor.

96.     Specifically, this letter states that "the demolition/remediation of the second floor of Building 2 began last week to remediate the mold issues. . . .  This work is continuing this

13

week.  Currently eight (8) units on the second floor have been demoed. . . .  As discussed, this work is limited to the second floor at this time, but is planned to progress to the upper floors."

97.      Defendants (through counsel) continued that "the Owner must take reasonable and prudent steps to continue to move the Project forward to completion and cannot simply put construction activities on hold."

98.      Such a statement is inconsistent with a demand that the Sureties perform pursuant to the Bond.

99.      Counsel's March 22 letter also says: "we reiterate that the Owner remains willing to pay the Balance of the Contract Price to the Sureties and have the Sureties take action pursuant to Section 5 of the Bond."

100.     This statement was the first time that Defendant attempted to satisfy section 3.3's condition precedent, notwithstanding counsel's use of the word "reiterate".

101.     By this time, however, Defendants already had materially depleted the Balance of the Contract Price by paying it to RP Oak Hill and to Arc's former subcontractors for work performed and materials supplied after Arc's termination.

102.     As of March 22, Defendants could not satisfy section 3.3's condition precedent.

103.     By letter dated March 24, 2022 (Exhibit 16), the Sureties (through counsel) reminded Defendants that "action that deprives the Sureties of their rights under the Bond or that prejudices these rights may constitute a breach of the Bond and discharge the Sureties."

104.     In response to the Sureties' March 24 letter, Defendants (through counsel) sent another letter dated April 5, 2022 (Exhibit 17).

**CHIESA SHAHINIAN & GIANTOMASI PC** ▪ 11 Times Square, 34th Floor ▪ New York, New York  10036 ▪ (212) 973-0572

105.    This letter repeated Defendants' contention that it is not "obligated to stand idle while [the Sureties] continue[] [their] investigation of unknown duration as damages continue to accumulate."

106.    Section 7 of the Bond, however, provides for the Sureties' reimbursement of such damages in the event of a proper claim.

107.    Defendants in fact were well aware that the Bond protects them against such damages, as the next sentence in counsel's letter specifically refers to the Sureties' liability "for the damages arising from Arc's breaches, including liquidated damages for delay."

108.    On April 29, 2022, Defendants (through counsel) advised the Sureties via telephone that Defendants obtained additional funding for the completion of the Contract.

109.    By letter dated May 11, 2022 (Exhibit 18), Defendant (through counsel) confirmed the advice provide in the April 29 telephone call.

110.    Defendants' May 11 letter again confirmed that, since Arc's termination, Defendants have been completing the Contract by performing, *inter alia,* "weatherizing/enclosure of Building 2 and select steel carpentry needed for enclosure of Building 1", "work to complete first floor commercial space to secure a temporary certificate of occupancy", "select sitework to bring utilities to the site", "demolition of on [sic] the Second Floor of building 2, including removal of drywall and fixtures/systems installed over the top of compromised materials."

111.    The letter also stated that Defendants have developed "an interim plan" to perform additional work.

112.    The work listed in the May 11 letter is a continuation of Defendants' performance of the Contract through RP Oak Hill.

**CHIESA SHAHINIAN & GIANTOMASI PC** · 11 Times Square, 34th Floor · New York, New York  10036 · (212) 973-0572

113.    The May 11 letter also advised that Defendants and its lenders are working "on an overall plan to achieve successful completion of the Project."

114.    The contents of the May 11 letter are inconsistent with a claim against the Bond.

115.    By letter dated May 31, 2022 (Exhibit 19), the Sureties denied Defendants' claim against the Bond, explaining that (a) Defendants failed to satisfy section 3.3's condition precedent and (b) Defendants materially breached the Bond by retaining their own replacement contractor and proceeding with completion of Arc's scope of work without affording the Sureties an opportunity to do so.

### FIRST CAUSE OF ACTION

116.    The Sureties repeat and reassert the allegations contained in paragraphs 10 through 115 with the same force and effect as if set forth at length.

117.    Defendants have asserted a claim against the Bond.

118.    Defendants have asserted that the Sureties will be liable "for the damages arising from Arc's breaches, including liquidated damages for delay."

119.    Defendants failed to satisfy the condition precedent contained in section 3.3 of the Bond.

120.    As a result, the Sureties' obligation under the Bond never ripened.

121.    An actual controversy exists among the parties as to the Sureties' obligations under the Bond (if any).

122.    The amount in controversy exceeds $11 million.

123.    Pursuant to 28 U.S.C. § 2201, the Sureties request judgment declaring that their obligation under the Bond never matured, and thus they are not obligated under the Bond (a) to complete, arrange for the completion of, or otherwise perform the Contract; (b) to indemnify

16

Defendants or any third parties for any amounts paid to complete the Contract or otherwise to complete the Project; (c) to indemnify Defendants or any third parties for any other damages, costs, and expenses they incur as a result of their termination of Arc for default or in completing the Contract or the Project; (d) to make any other payment to Defendants or any third parties; and (e) otherwise to Defendants or any third parties.

## **SECOND CAUSE OF ACTION**

124.    The Sureties repeat and reassert the allegations contained in paragraphs 10 through 115 with the same force and effect as if set forth at length.

125.    Defendants have asserted a claim against the Bond.

126.    Defendants have asserted that the Sureties will be liable "for the damages arising from Arc's breaches, including liquidated damages for delay."

127.    Defendants' retention of RP Oak Hill as replacement contractor, their continued performance of the work that is the subject of the Contract, and their material depletion of the Balance of the Contract Price, all as described above, deprived the Sureties of their rights and remedies under the Bond.

128.    Defendants materially breached the Bond.

129.    As a result of Defendants' material breach of the Bond, the Sureties are discharged from obligation thereunder.

130.    An actual controversy exists among the parties as to the Sureties' obligations under the Bond (if any).

131.    The amount in controversy exceeds $11 million.

132.    Pursuant to 28 U.S.C. § 2201, the Sureties request judgment declaring that Defendants materially breached the Bond, discharging the Sureties from obligation thereunder,

17

and thus the Sureties are not obligated under the Bond (a) to complete, arrange for the completion of, or otherwise perform the Contract; (b) to indemnify Defendants or any third parties for any amounts paid to complete the Contract or otherwise to complete the Project; (c) to indemnify Defendants or any third parties for any other damages, costs, and expenses they incur as a result of their termination of Arc for default or in completing the Contract or the Project; (d) to make any other payment to Defendants or any third parties; and (e) otherwise to Defendants or any third parties.

   **WHEREFORE,** the Sureties request judgment as follows:

   (1)   on the First Cause of Action, declaring that their obligation under the Bond never matured, and thus they are not obligated under the Bond (a) to complete, arrange for the completion of, or otherwise perform the Contract; (b) to indemnify Defendants or any third parties for any amounts paid to complete the Contract or otherwise to complete the Project; (c) to indemnify Defendants or any third parties for any other damages, costs, and expenses they incur as a result of their termination of Arc for default or in completing the Contract or the Project; (d) to make any other payment to Defendants or any third parties; and (e) otherwise to Defendants or any third parties;

   (2)   on the Second Cause of Action, declaring that Defendants materially breached the Bond, discharging the Sureties from obligation thereunder, and thus the Sureties are not obligated under the Bond (a) to complete, arrange for the completion of, or otherwise perform the Contract; (b) to indemnify Defendants or any third parties for any amounts paid to complete the Contract or otherwise to complete the Project; (c) to indemnify Defendants or any third parties for any other damages, costs, and expenses they incur as a result of their termination of

18

Arc for default or in completing the Contract or the Project; (d) to make any other payment to

Defendants or any third parties; and (e) otherwise to Defendants or any third parties; and

(3)     awarding the Sureties attorney's fees, costs, disbursements, and such other and

further relief as the Court may deem just and proper.

Dated: June 1, 2022

**CHIESA SHAHINIAN & GIANTOMASI PC**
Attorneys for Plaintiffs


By:   ___*/s Adam P. Friedman*___
          Adam P. Friedman

11 Times Square, 34th Floor
New York, New York  10036
(212) 973-0572

19